## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

BOBBY CHARLES BYRD                              CIVIL NO. 5:12-1956

VERSUS                                          JUDGE ELIZABETH E. FOOTE

CITY OF BOSSIER, ET AL                          MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court are motions for summary judgment filed by the City of Bossier, Officer Roy Short, the City of Shreveport, Detective Robert Gordon, Sergeant W.W. Lindsey, and Corporal Christopher Yarborough.  [Record Documents 38 and 41].  The Plaintiff, Bobby Byrd ("Mr. Byrd"), brings claims under 42 U.S.C. § 1983 and Louisiana tort law, alleging that the defendant officers used excessive force when they fished him out of the Red River.  Mr. Byrd jumped into the Red River after leading the officers on a car chase through downtown Shreveport, over the Texas Street Bridge, down Traffic Street, and onto the levee.  In the course of arresting Mr. Byrd, the officers struck him on his back, arms, upper torso, and face, rendering him unconscious and fracturing the bones surrounding his left eye.  The officers assert that they are entitled to qualified immunity, and the cities argue that they are not liable under the doctrine of Monell v. Dep't. of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).  The Court will address both motions simultaneously, as they present overlapping factual and legal arguments. For the following reasons, the Court **GRANTS** both Motions for Summary Judgment

1

[Record Documents 38 and 41] and **DISMISSES WITH PREJUDICE** Mr. Byrd's claims against all Defendants.

## I.    FACTUAL BACKGROUND[1]

In July 2011, Detective Robert Gordon of the Shreveport Police Department ("Detective Gordon") was investigating a series of burglaries in which coin operated machines were forced open or stolen.  Video footage showed a white or Hispanic man burglarizing the Tiki Bar and Grill while a white or cream colored minivan sat outside the establishment.  On July 20, 2011, Detective Gordon learned that the same van was parked at the Levington Motel.  He waited outside the motel in an unmarked car until a white male got into the van and drove from the parking lot.  Detective Gordon called for marked units to conduct a traffic stop.

Corporals Coburn and Mormon, both of the Shreveport Police Department, made the stop at the corner of Caddo and Louisiana streets.  They walked towards the van and ordered the driver to exit.  Instead, Mr. Byrd sped away.  Corporals Coburn and Mormon pursued the van in separate vehicles followed by Detective Gordon.  The parties dispute whether Mr. Byrd ran any red lights or stop signs and whether he exceeded the speed limit during the chase.  He drove from Louisiana Street to Texas Street, across the Texas Street bridge (a bridge connecting downtown Shreveport to a busy, commercial area of Bossier City), made a left at Traffic Street, abandoned his van on the levee, fled on foot through an overgrown area, and ended up in the Red River.

---

[1] Unless otherwise noted, the following narrative is taken from the undisputed portions of the parties' statements of facts.

2

None of the chasing cars was able to catch up to him.

When Detective Gordon arrived at the abandoned van, he called in reinforcements, including a canine unit, to track Mr. Byrd through the overgrowth. Corporal Yarborough, a canine officer with the Shreveport Police Department, responded with his canine Mico.  He announced loudly that a canine was in the area and that if the suspect did not identify himself, the dog would be sent in to track him and would bite him.  Corporal Yarborough and Mico, accompanied by Officer Roy Short ("Officer Short") of the Bossier City Police Department, tracked Mr. Byrd through the woods, eventually arriving at an overgrown area where a tree had fallen into the river. The bank was steep, and Corporal Yarborough knew that Mico felt that the suspect was close.  At that moment, the ground below Mico caved in, and he fell into the river.[2] Mico was still attached to the fifteen-foot tracking lead, so in order to prevent himself from being pulled in and Mico from drowning, Corporal Yarborough let go of the lead. In his deposition, Corporal Yarborough stated that when he let go of the lead he believed that the suspect was in the brush somewhere nearby and that he expected Mico to return to the bank.  Instead, Mr. Byrd's head appeared above water about fifteen to twenty feet away from the bank.  Mico began swimming towards him. Corporal Yarborough repeatedly called Mico back, but Mico continued to swim towards

---

[2] Mr. Byrd has testified that he did not hear any officer release the dog into the water, and he offers no evidence to contradict Corporal Yarborough's testimony that the dog accidentally fell in and pursued Mr. Byrd despite Corporal Yarborough's attempts to recall him.  [Record Document 41-20, p.10].

3

Mr. Byrd, eventually reaching him and biting his arm.[3]  Corporal Yarborough jumped into the water and began to swim towards the struggling pair.  Mr. Byrd pushed Mico's muzzle below water, and Mico released the bite and began to swim in circles, disoriented.  Eventually, Mico made his way to Corporal Yarborough, who was able to lead him back to the bank.   Still disoriented, Mico bit Corporal Yarborough, inflicting a wound that required Corporal Yarborough to leave the scene.

At this point, Mr. Byrd's recollection begins to differ from that of the officers. While Corporal Yarborough was leaving, both Officer Short and Mr. Byrd remember that Mr. Byrd was yelling for help and screaming that he could not swim and that he was drowning.  Mr. Byrd remembers thinking that he was going to die.  Officer Short then jumped into the water and swam towards Mr. Byrd.  Reaching him, he pulled him to the shore.  Mr. Byrd remembers repeating the words "thank you" as he was dragged to shore by Officer Short.  He recalls being completely cooperative while he put his hands behind his back and allowed himself to be handcuffed in neck-high water.  His next recollection is the heart of his excessive force claim:

> As he was handcuffing me, the other officer, the Shreveport Officer, the detective, Detective Gordon run into the water and grabbed me by the top of my hair and slammed my head up underneath the water.  As he slammed my head underneath the water, I was trying to push my head back up because I can't breathe.  I pulled my head back up, they started punching me.  I was feeling licks to the front, face, back.  They was coming from every direction.  They dunked me back up underneath the water again.  The same thing.  When he pulled me up again, he punched

---

[3] Mr. Byrd remembers hearing Corporal Yarborough call the dog back, though he also remembers other officers yelling "[g]et him, or something like that or He [sic] is getting him." Id.

on me some more.

When they drug me to the bank, they slammed my face down into the mud.  I am turning my face.  They are steadily hitting me.  One of them was kicking me because he busted my ribs up.  They was pulling my arms up between my shoulder blades . . .

. . .

Then as I turned my head, they had my head buried down in there and they were hitting me.  I couldn't breathe.  I turned my head.  Right at the point that I turned my head, one of them – I believe it was Officer Gordon standing directly over me hit me in my eye and that's – after that I don't remember nothing.

[Record Document 41-20, pp. 12-13].  In short, Mr. Byrd contends that although he was cooperating with the officers, he was brutally beaten after he allowed himself to be handcuffed in neck-deep water.

The officers tell a very different story.  While Corporal Yarborough was exiting the scene, Detective Gordon and Officer Short called out to Mr. Byrd to swim to the shore.  Seeing that he was making no effort to do so, and hearing him yell that he could not swim, Officer Short jumped in to bring him back to shore.  Officer Short was able to drag him, without any help from Mr. Byrd, as far as a branch that was leaning over the river.  Mr. Byrd grabbed onto the branch and would not let go.  Officer Short was unable to pull him off, so Detective Gordon jumped in, swam to the branch and delivered a single "distraction strike" to the side of Mr. Byrd's neck.  The strike caused Mr. Byrd to release his grip and enabled the officers to bring him close to the bank, where Sergeant W.W. Lindsey of the Shreveport Police Department ("Sergeant Lindsey") and Corporal Mormon were waiting.

Detective Gordon advised the waiting officers that Mr. Byrd had not been searched and that they did not know whether he was armed.  Detective Gordon and Officer Short both testify that they were exhausted.  Photographs taken at this time show two officers behind Mr. Byrd about waist deep in the water while Mr. Byrd's upper torso is on the bank. [Record Document 38-6, pp. 18-22].  Describing these photos during Mr. Byrd's criminal trial, Detective Gordon noted that the riverbed drops off very quickly from the bank.  [Record Document 38-18, pp. 53-56].  The photos show four officers surrounding Mr. Byrd close to the bank just before the steep dropoff.  The officers behind Mr. Byrd are in waist or neck deep water.  Each officer recalls that despite repeated commands to place his arms behind his back, Mr. Byrd continued to reach towards his front waistband, which was underwater.  Fearing for their safety and attempting to disorient Mr. Byrd so they could control his hands, the officers delivered "distraction strikes"—meaning hard, closed-hand blows—to Mr. Byrd's back, arms, head, and upper torso.  Sergeant Lindsey remembers hitting him several times.  Officer Short remembers striking him several times on the back and arms.   Detective Gordon remembers striking him on the head and upper torso.  Finally, the officers were able to wrench Mr. Byrd's arms behind his back and Corporal Mormon cuffed him.  No blows were delivered after he was in handcuffs.

The officers have testified that because Mr. Byrd still refused to respond to commands, they had to drag him up the bank.  In the meantime, other officers had commandeered a boat onto which they loaded Mr. Byrd.  He was transported to the

Louisiana Boardwalk, where the Bossier City Fire Department treated him and then transported him to LSUHSC for further treatment.  He was unconscious when he arrived at LSUHSC.[4]  [Record Document 41-14, p.3].  At LSUHSC, Mr. Byrd was treated for a left orbital floor fracture, a nasal bone fracture, and a dog bite wound. He tested positive for cocaine.  [Record Document 54-2, p.6]. He was also diagnosed with acute kidney injury, which appears to have resolved itself while he was in the hospital.  Id. at 4, 6.  About a week later, he had surgery for open reduction and internal fixation of the left orbital floor, and he was discharged to prison in stable condition.  Id. at 6.

Charges were filed against Mr. Byrd in both Caddo and Bossier Parishes.  In Bossier Parish, he was charged with Simple Burglary, in violation of Louisiana Revised Statute 14:62.  He pled guilty and was sentenced to a term of five years at hard labor. In Caddo Parish, he was charged with Aggravated Flight from an Officer, in violation of Louisiana Revised Statute 14:108.1 and found guilty by a jury.   The Caddo Parish Court found the Defendant to be a fourth felony habitual offender and sentenced him to life imprisonment, pursuant to Louisiana Revised Statute 15:529.1.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary Judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure if the movant shows that there is no genuine dispute as to any material fact

---

[4] Mr. Byrd has testified that he lost consciousness after Detective Gordon struck him in the head.  The officers do not specify when Mr. Byrd lost consciousness, though they contend that he was not responding to commands after he was handcuffed and that he had to be dragged onto the shore.

and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  While the movant typically bears the burden of demonstrating that summary judgment is appropriate, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), when the qualified immunity defense has been raised the plaintiff bears the burden of negating the defense, even at summary judgment.  Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008) (citing Pierce v. Smith, 117 F.3d 866, 872 (5th Cir. 1997) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs." (internal quotation marks omitted))).  A genuine dispute for trial exists when a rational trier of fact looking at the record could find for the non-moving party.  Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Co., 475 U.S. 574, 586-87 (1986); Wallace v. Tex. Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).

### B.    Qualified Immunity and Excessive Force

The doctrine of qualified immunity shields government officials from suits "for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law."  Thompson v. Upshur Cnty., TX, 245 F.3d 447, 456 (5th Cir. 2001).  In order to defeat a qualified immunity defense, then, the plaintiff must present sufficient evidence to raise a genuine dispute as to whether: (1) the officers' "conduct violated an actual constitutional right, and (2) the officers' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."  Poole v. City of Shreveport, 691 F.3d 624,

627 (5th Cir. 2012) (citing Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008) (internal quotation marks omitted)).  Courts have discretion to decide in which order to engage these two prongs.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  The Court must not under either prong resolve genuine disputes of fact in favor of the party seeking summary judgment.  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).

In Graham v. Connor, the Supreme Court held that claims that excessive force was used in making an arrest must be analyzed under the Fourth Amendment's objective reasonableness standard, rather than under a substantive due process standard.  490 U.S. 386, 394-95 (1989).  No Fourth Amendment violation occurs if the officer's actions were objectively reasonable at the time rather than from "the 20/20 vision of hindsight."  Id. at 396.  An officer's subjective intentions or motives play no part in the analysis, as the Constitution only requires that his actions be objectively reasonable.  Id. at 397.  Judging the reasonableness of an officer's actions requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983))) (internal quotation marks omitted).  The standard is objective reasonableness under the totality of the circumstances, and "[f]actors to consider include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 396.

9

### C.    Genuine Factual Disputes

When ruling on a motion for summary judgment, the Court evaluates the evidence in the light most favorable to the nonmovant and does not weigh evidence or judge credibility.  EEOC v. Chevron Phillips Chem. Co., 570 F.3d 606, 615 (5th Cir. 2009).  In practice, this means that where there is a wide divergence between the plaintiff's and the defendant's version of the facts, the Court simply accepts the plaintiff's version for the purpose of ruling on the motion for summary judgment.  Scott v. Harris, 550 U.S. 372, 378-79 (2007).  Any factual disputes raised by the plaintiff, however, must be genuine.  J&J Sports Prod., Inc. v. Mandell Family Ventures, L.L.C., --- F.3d ---, 2014 WL 1757307, at *1 (5th Cir. May 2, 2014).  Where a video recording, or conceivably some other unquestionable form of evidence, contradicts the plaintiff's recollection to such a degree that no reasonable juror could credit the plaintiff's testimony, the court must accept the facts as shown in the recording.  Id., see also Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

## III.  ANALYSIS

### A.    Mr. Byrd's Testimony

There is no question that Mr. Byrd's testimony that he was beaten after he was handcuffed and had stopped resisting would raise a factual dispute material to whether

the officers are entitled to qualified immunity.  See Brown v. Lynch, 524 F. App'x 69, 81 n.49 (5th Cir. 2013) ("At the time of the incident, the law was clearly established in this circuit that repeatedly striking a non-resisting suspect is excessive and unreasonable force."); Anderson v. McCaleb, 480 F. App'x 768, 772 (5th Cir. 2012) (officers should have known they could not use a taser against or beat the suspect after he stopped resisting arrest or slam him to the ground after he was handcuffed); Bush v. Strain, 513 F.3d 492, 501 (5th Cir. 2008) (an officer used excessive force when he slammed a handcuffed suspect who had ceased resisting arrest into a car window).  Were the officers' testimony the only evidence contradicting Mr. Byrd's testimony, the Court would be obliged to accept his version and deny summary judgment.  Defendants, however, have offered a video of the car chase and photographs of Mr. Byrd's arrest which call critical portions of his testimony into question.

One photograph was taken as the officers attempted to handcuff Mr. Byrd. [Record Document 38-6, p.20].  It shows at least two officers in chest-deep water behind Mr. Byrd, whose torso is visible above the water approximately two feet from the bank, and one officer standing above Mr. Byrd on the edge of the river.  Mr. Byrd is turned on his side so that his chest and upper torso are facing the photographer. The officer behind Mr. Byrd and closest to the photographer has grabbed Mr. Byrd's right forearm, which is raised above his right side.  Mr. Byrd's left arm and hand are not visible.  The officer standing over Mr. Byrd appears to be using his left hand to push Mr. Byrd's face down in the direction of the water, which is about two feet below his

11

head, and his right arm to hold onto the back of Mr. Byrd's upper right arm.

Defendants argue that this photo clearly shows that Mr. Byrd was resisting arrest before he was handcuffed, which contradicts his testimony that he was perfectly compliant and that the officers struck him only after he was handcuffed.  In response, Mr. Byrd argues that different interpretations of the picture are possible and that it is not clear from the picture whether he is handcuffed:

> The pictures do not exonerate anyone from liability.  The pictures do not speak, and they show only what they show.  It is incorrect to believe that the picture to which Short refers clearly demonstrates that Byrd is not handcuffed.  No one can see Byrd's hands, he is lying on his left shoulder, his left hand is not visible, and his right hand is not visible, only his right elbow and part of his right forearm.  That interpretation is only counsel's and not supported by the photograph.

[Record Document 54, p. 9].

Having reviewed the photo, the Court finds that no reasonable jury could believe Mr. Byrd's testimony regarding the officers' use of force.  There is no question that Mr. Byrd is not handcuffed in the photo—his right hand is clearly free—that he is close to the bank, and that some sort of struggle is taking place.  The Court may not, however, disregard the entirety of Mr. Byrd's testimony merely because no reasonable jury could believe portions of it.[5]  To do so would be to violate the rule that the facts must be

_____

[5] Defendants also argue that Mr. Byrd's testimony regarding his role in the burglaries, the nature of his injuries, and the car chase is contradicted by his guilty plea in Bossier Parish, his medical records, and the video of the car chase.  While these arguments would certainly cast a dark shadow over Mr. Byrd's credibility, the precise extent of Mr. Byrd's injuries and whether he actually committed the underlying burglaries are not material to the question of whether excessive force was used.  The discrepancies between Mr. Byrd's testimony regarding the car chase and the video of the car chase are addressed below.

viewed in the light most favorable to the plaintiff and would substitute the court's credibility judgment for the jury's.  Tolan, 134 S.Ct. at 1866; Chevron Phillips Chem. Co., 570 F.3d at 615.  The Court will therefore only disregard those portions of Mr. Byrd's testimony that no reasonable jury could believe and will continue to view the remaining portions in the most favorable light.   See Anderson, 480 F. App'x at 772 (refusing to disregard those portions of plaintiff's story that are not blatantly contradicted by his medical records.).

Mr. Byrd is correct that the photo, on its own, does not contain enough information to tell the full story.  Although it shows that the parties were struggling before Mr. Byrd was handcuffed, it does not show why the parties were struggling, who started the struggle, or the exact sequence of events.  It can only be interpreted in light of the testimony.  While the photo is consistent with the officers' story that Mr. Byrd was resisting being handcuffed, it could also conceivably be consistent with a story that was more favorable for Mr. Byrd.  For example, Mr. Byrd could have testified that he was complying with the instructions to place his hands behind his back but that the officers attacked him before he could be handcuffed.  Or he could have testified that he was simply attacked before he even had a chance to comply.  The problem for Mr. Byrd is that his testimony does not tell either of these stories or any other story that is consistent with this photograph.  Mr. Byrd has testified that he allowed himself to be handcuffed peacefully and that the officers then began to strike him.  He is very clear that he was not struck at all before he was handcuffed and that he did not resist

13

the officers' efforts to move his body at any time:[6]

Q.     What happened? You all were coming towards the bank and you got about chest deep and what happened?

A.     Yes, ma'am.  That is when we were standing there and he told me to put my hands behind my back. He began to put the handcuffs on me.  That is when Officer Gordon come off of the bank –

Q.     I want to get to that.  The Bossier City Officer told you to put your hands behind your back and you did?

A.     I complied, yes, ma'am.  Still saying thank you.

Q.     Did the Bossier City Officer cuff you?

A.     Yes ma'am.

Q.     Were you handcuffed before Detective Gordon came into –

A.     Yes ma'am.

---

[6] Mr. Byrd does not identify which portion of his testimony contradicts the officers' testimony, merely stating in a conclusory manner that there is conflicting testimony regarding whether he was struck while handcuffed.  The Court will assume that Mr. Byrd is relying on the portions of his own testimony that state that he was handcuffed and then beaten.  Mr. Byrd does cite to the deposition of Officer Short and the testimony of Detective Gordon during the state court preliminary examination. [Record Document 52, p. 2].  The Court fails to see how this testimony raises a question regarding whether Mr. Byrd was struck while handcuffed and whether he resisted arrest.  The cited portion of Detective Gordon's testimony states that Mr. Byrd was "in waist to chest deep water" when he was handcuffed, which is consistent with the photo in question, the testimony of other officers, and Mr. Byrd's testimony.  Id. Similarly, the Court fails to see the how the cited portion of Officer Short's deposition conflicts with the testimony that Mr. Byrd was not struck while he was handcuffed. Officer Short states that he struggled with Mr. Byrd and struck him three or four times in order to distract him while he was attempting to handcuff him.  [Record Document 38-14, pp. 9-11].

[Record Document 41-20, pp. 13-14].

> Q.     Before you were handcuffed, were you struck at any time?
>
> A.     No.  Not before I was cuffed.
>
> Q.      All of the strikes and punches that we have discussed occurred after you were handcuffed?
>
> A.      After Officer Short pulled me up and put my hands behind my back and Detective Gordon came and dunked my head under the water is when the strikes began.

Id. at pp. 17-18.

> Q.     With regards to the question whether you resisted at any time officers' efforts to move any part of your body, it is your testimony you were, quote, completely compliant.  Is that right?
>
> A.     Yes, sir.

Id. at pp. 20.  This testimony blatantly contradicts the photographic evidence.  Even viewing both in the light most favorable to Mr. Byrd, no reasonable jury could square the two.  Accordingly, for the purpose of the motion for summary judgment, the Court must disregard the above cited portions of Mr. Byrd's testimony.

## B.     Excessive Force

The first prong of the qualified immunity analysis is whether viewing the totality of the circumstances the officers acted in an objectively reasonable manner in striking Mr. Byrd during his apprehension.  The parties key their arguments to the Graham factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  While the officer's actions

should be evaluated separately if possible, the Court will analyze the actions of

Sergeant Lindsey, Detective Gordon, and Officer Short together since the undisputed

testimony makes clear that they worked as one body to subdue and apprehend Mr.

Byrd and each used essentially the same amount and type of force.  Poole, 691 F.3d at

628.  Corporal Yarborough's handling of Mico will be analyzed separately.

### 1.  Sergeant Lindsey, Detective Gordon, and Officer Short

### a.  The Graham factors

Mr. Byrd argues that he was not attempting to flee from the officers or actively

resist arrest.  [Record Document 54, p. 8].  In order to make this argument, however,

Mr. Byrd has to completely ignore the undisputed facts that he pulled out from a traffic

stop, led the officers on a high-speed chase through downtown Shreveport, which is

documented on video, and then jumped in a river.[7]  No reasonable jury viewing these

facts could find that he was not attempting to evade arrest when he fled and jumped in

the river, an action which unquestionably set the stage for the altercation in the water.

See e.g.  Bazan v. Hidalgo County, 246 F.3d 481, 493 (5th Cir. 2001) (explaining that

plaintiff's flight prior to the use of force was relevant as it "set the stage for what

---

[7] Mr. Byrd has testified that he obeyed all traffic signals during his flight and drove no more than forty miles per hour.  [Record Document 41-20, pp. 8, 21-22].  The video does not conclusively show whether Mr. Byrd ran any red lights, as his van is not in the camera's field of vision during most the chase.  No reasonable jury viewing the video, however, could believe his testimony that he obeyed all traffic signals and never exceeded forty miles per hour.  The chasing cars never completely stopped at red lights or stop signs, traveled at a high rate of speed between intersections, reached sixty-five miles per hour on the Texas Street Bridge, and still did not manage to close Mr. Byrd's initial ten-second advantage.  [Record Document 38-7].

followed in the field"); Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1991) (finding the officer's use of deadly force was objectively reasonable where the plaintiff led the officer on a dramatic car chase and escaped an attempted road blockade, proving that "he would do almost anything to avoid capture").  Furthermore, Mr. Byrd has failed to point to any evidence, except those portions of his own testimony which the court must disregard, to rebut the testimony of the officers that he was resisting being handcuffed in the river.  Mr. Byrd has therefore failed to raise a genuine dispute regarding whether he was resisting arrest.

Mr. Byrd's argument regarding the severity of the crime for which he was suspected is also untenable.  He argues that he was not a suspected felon when he was pulled over for a mere traffic offense, which ignores both that when he was pulled over he was suspected of having committed numerous burglaries and that, in any case, when he fled the scene at high speed through downtown Shreveport he was suspected of aggravated flight from an officer, another felony.

Regarding whether he posed an immediate threat to the officers and whether the situation was tense, uncertain, and rapidly evolving, Mr. Byrd argues that he was unarmed and that the situation in the river was controlled.  He notes that the officers had set up a perimeter and that when they found him he was passively swimming. Defendants respond that the events in the river must be viewed in light of the preceding car chase and the fact that Mr. Byrd was suspected of multiple felonies. Furthermore, at the time, the officers did not know whether Mr. Byrd was armed.

Defendants also point to Mr. Byrd's own testimony that he was having trouble staying afloat, that he was calling for help, and that he thought he was going to die.

It is important to remember that these events must be viewed from the perspective of a reasonable officer in the situation.  Whether or not Mr. Byrd in fact turned out to be armed is beside the point.  See Hudspeth v. City of Shreveport, 270 F. App'x 332, 337 (5th Cir. 2008) ("The Officers had an articulable basis to believe Hudspeth was armed and could reasonably have perceived him as posing a threat of serious bodily harm . . .  That Hudspeth was unarmed is also irrelevant.").  Given the preceding car chase and the fact that Mr. Byrd was suspected of multiple felonies, there is no question that it would have been reasonable for the officers to assume that he was armed or at least dangerous.  Furthermore, Mr. Byrd has offered no evidence to rebut the testimony that the river environment made the situation extremely dangerous and unpredictable for everyone involved.  Once again, Mr. Byrd himself testified that he thought he was going to die, which belies his counsel's unsupported statements that the situation was placid and controlled.

### b.  The Amount of Force Used and Defendants' Daubert Motions [Record Documents 43 and 48]

The amount of force used by the officers to subdue Mr. Byrd, that is, the intrusion into Mr. Byrd's Fourth Amendment interests, must be balanced against the amount of danger an objective officer would have perceived.  Mr. Byrd emphasizes the severity of his injuries, noting that he spent a week in the hospital and required surgery for multiple broken bones in his face.  It is also undisputed that he was unconscious

18

when he reached the hospital.  He also relies on the report of his expert, Mr. Lloyd

Grafton.  Defendants have both filed Daubert motions seeking to exclude Mr. Grafton's

testimony.  [Record Documents 43 and 48].

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., trial judges must exercise a

gatekeeping function and exclude unreliable expert testimony.  509 U.S. 579, 592-93

(1993).  The factors taken into account to determine reliability, and the ultimate

determination of reliability, are left to the discretion of the trial judge, but the ultimate

goal of Daubert analysis is to identify and exclude expert testimony that is based only

on unsupported speculation or subjective belief.  Thomas v. City of Winnfield, 2012 WL

1255265, at *3 (W.D. La. Apr. 13, 2012) (rev'd on other grounds sub nom. Thomas v.

Nugent, 529 F. App'x. 456 (5th Cir. 2013) (vacated --- S. Ct. ----, 82 USLW 3496, 2014

WL 235065 (May 19, 2014))) (citing Daubert, 509 U.S. at 590; Munoz v. Orr, 200 F.3d

291, 301 (5th  Cir. 2000)).  The Supreme Court has suggested that the following four

factors be taken into account:

(1)    whether the expert's theory or technique can be or has been tested;

(2)    whether the expert's theory has been subjected to peer review;

(3)    the known or potential rate of error of the particular scientific technique
       or standard; and

(4)    whether the scientific technique or standard is generally accepted in the
       scientific community.

Daubert, 509 U.S. at 593-594.  These factors make clear that the expert must, at a

minimum, be able to explain how and why he reached his conclusions.  See Santoro v.

19

Donnelly, 340 F. Supp.2d 464, 475 (S.D.N.Y. 2004) ("Although experts may rely on
existing data, nothing in either Daubert or the Federal Rules of Evidence requires a
district court to admit opinion evidence that is connected to existing data only by the
*ipse dixit* of the expert.  They must still explain how and why they could have
extrapolated their opinions from the data.") (internal quotation marks and citations
omitted).  The Daubert principles have been incorporated into Federal Rule of Evidence
702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in
> issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of
> the case.

Applying these principles, the Court finds Mr. Grafton's opinions regarding the use of
force in handcuffing Mr. Byrd unreliable, and therefore will not consider them in the
following summary judgment analysis.  Mr. Grafton's report relies on factual
assumptions that contradict the undisputed facts, fails to explain how he arrived at his
conclusions, and applies the wrong legal standard for an excessive force claim.

Beginning with Mr. Grafton's erroneous factual assumptions, he states that there
is no type of technique taught in the Pressure Point Control Tactics training ("PPCT"),

which is used by the Shreveport Police Department, that involves the type of blows to the head delivered by the officers.  [Record Document 54-4, p. 6].  This statement, however, is demonstrably untrue.  As Mr. Armbruster, Defendants' expert, points out, the PPCT does include hard, empty hand techniques to the head and face in order to mentally disorient or stop an aggressive suspect.  [Record Document 41-21, pp. 18-24].  Mr. Grafton also notes that there were "no exigent circumstances" and that "[t]he terrain and weather were good."  [Record Document 54-4, p.7].  These statements ignore the undisputed facts that Mr. Byrd and the officers were in a deep river and that Mr. Byrd has testified he thought he was going to drown.  Mr. Grafton himself appears to recognize this contradiction when, a few paragraphs later, he notes that the "Red River was a legitimate concern and hazard."  Id.   He further opines that the officers did not know who they were pursuing and that Mr. Byrd could have turned out to be someone without a driver's license who simply panicked and fled.  Id.  This ignores the fact that the driver of the van was suspected of committing multiple burglaries.  Finally, Mr. Grafton's report relies on the fact that Mr. Byrd was not armed.  The relevant inquiry for excessive force analysis, however, is not whether the suspect turned out to be armed but whether the officers had reason to believe that he was armed.  Hudspeth, 270 F. App'x at 337.  For the bulk of Mr. Gafton's report, he weighs the Graham factors in exactly the same way a jury composed of lay persons would be expected to weigh them.  In the portion of the report where he brings his expertise regarding proper police procedure for subduing suspects to bear on the facts of the

case, however, he fails to explain the conclusion he reaches:

> Proper procedure and the following of their PPCT training would have been to put Byrd's hands behind his back and apply handcuffs.  If hard hand techniques were necessary, they could have been used without blows to the head, such as a wrist lock or pressure point techniques.

[Record Document 54-4, pp. 6-7].[8]  No explanation is given for why the recommended techniques would have been feasible in a deep river with an apparently dangerous suspect resisting arrest.  At a minimum, Mr. Grafton is required to explain why his recommendations were the proper procedure.  In the face of the report's numerous incorrect factual assumptions and its conclusory opinion, the Court cannot say that it is reliable, and therefore must disregard it.

### c.   Liability of Sergeant Lindsey, Detective Gordon, and Officer Short.

On the present state of the record, the Court finds that no reasonable jury could find that Detective Gordon, Sergeant Lindsey, and Officer Short acted in an objectively unreasonable manner.[9]  Mr. Byrd has simply presented no evidence from which a reasonable jury could rely to dispute the high degree of danger an objectively reasonable officer would have perceived when a suspected felon led him on a high-

---

[8] This statement contains another clear error.  As Defendant's expert points out, according to the PPCT, wrist locks and pressure point techniques are not technically "hard hand" techniques, but "soft hand" techniques.  [Record Document 41-21, pp. 33-35].

[9] The Court need not address Officer Short's argument that any claim that he caused Mr. Byrd's head injuries is mere speculation because the Court finds that Officer Short would not have violated Mr. Byrd's Fourth Amendment rights by striking him on the head regardless.

speed car chase, jumped in a river, resisted being handcuffed, and reached below water towards his waistband. In this situation, no reasonable jury could find that the officers acted unreasonably in resorting to blows to his head and upper torso to subdue him long enough to get the handcuffs on. It is true that Mr. Byrd was severely injured, but he has failed to provide any evidence suggesting that the force that caused his injuries was not objectively reasonable. The bottom line is that while the evidence must be viewed in the light most favorable to Mr. Byrd, he has simply presented no evidence, apart from those portions of his own testimony that no reasonable juror could believe, to support his claim.

### 2. Corporal Yarborough

Mr. Byrd has also failed to present any evidence from which a jury could find Corporal Yarborough liable for releasing Mico. Corporal Yarborough has testified that Mico fell in accidentally, that he let go of the leash so that Mico did not drown and so that he did not fall in, and that he did not know that Mr. Byrd was in the water when he released the leash. He has also testified that he called Mico back and that he jumped in to retrieve Mico when it was clear that Mico was not responding to commands. Mr. Byrd has failed to dispute any of this testimony. The only evidence he has offered that could conceivably support his claim against Corporal Yarborough is his testimony that he heard officers on the shore yelling "get him" after Mico was in the water.[10] Even

---

[10] Mr. Grafton opines that the canine should not have been released into the water. [Record Document 54-4, p. 5]. Mr. Byrd does not cite to this portion of Mr. Grafton's report in his opposition. Nevertheless, the Court notes that Mr. Grafton has not demonstrated any grounds for being qualified as an expert in canine usage. In a

assuming, though, that some of the officers expressed a desire for Mico to injure Mr.

Byrd, and further assuming that Corporal Yarborough shared their motivation, an

officer's subjective intentions play no part in the excessive force analysis.  Graham, 490

U.S. at 397.  Viewing the actions Corporal Yarborough actually took, no reasonable jury

could find that he acted unreasonably in either releasing Mico or attempting to retrieve

him.[11]

---

recent case in the Middle District of Louisiana, the plaintiff who presented Mr. Grafton's testimony admitted that Mr. Grafton was not qualified as an expert in canine usage. Stanjac v. Jenkins, Civil Action No. 10-829, 2012 U.S. Dist. LEXIS 125613, 2012 WL 3862377, at *13 (M.D. La. Sept., 5, 2012) (noting that plaintiff conceded that Mr. Grafton is not qualified to testify as an expert in the use of canines but qualifying him to testify regarding the use of force continuum and the PPCT).  This Court also declines to certify Mr. Grafton as an expert in the use of canines.  While Mr. Grafton represents that he has been an Associate Professor of Criminal Justice in the University of Louisiana System for twenty-three years and a U.S. Special Agent for twenty-three years, he has offered nothing to show his expertise in the use of canines.  [Record Document 54-4, p. 3].  Mr. Byrd contends that Mr. Grafton should be allowed to testify regarding whether the Shreveport Police Department canine policy was followed.  The Court does not, however, find that any such expert testimony would be helpful to the jury, as any fact-finder should be able to read and apply a policy.  See Thomas, 2012 WL 1255265, at *5 ("The trier of fact does not require assistance from an individual with expertise to determine whether the officers did or did not follow procedures which are clearly set forth in admissible documentary evidence.").

[11] Mr. Byrd fails to raise a genuine dispute of material fact when he argues that Corporal Yarborough violated the Shreveport Police Department Canine Unit Operations Manual by using Mico in ninety-eight-degree weather.  [Record Document 54, pp. 10-11].  Without citation, Mr. Byrd states that "[a] survey of the weather in Shreveport on July 20, 2011, indicates that during that very hot summer, temperatures were in excess of 100 degrees for several days, and 98 or above on that day."  Id. at 11.  Assuming that this violation of the policy would raise an issue of fact material to the excessive force claim, which is far from clear, Mr. Byrd's unsupported assertion that the temperature exceeded ninety-eight degrees at the time Mico was deployed is not competent summary judgment evidence.  It is the plaintiff's burden at the summary judgment stage to present actual evidence in support their claim.  Unsupported assertions will not suffice.  RSR Corp. v. Int'l Ins. Co., 612 F.3d 851, 857 (5th Cir. 2010)

**B.     The Second Prong of Qualified Immunity, Municipal Liability, and the Pendant State Law Claims**

Because Mr. Byrd has presented no evidence to support his claim that the officers violated his federal rights, the Court need not consider the second prong of the qualified immunity analysis, that is, whether the officers' actions were objectively reasonable in light of clearly established law.  See Hudspeth, 270 F. App'x at 336 ("As the district court properly concluded, there was no constitutional violation. Accordingly, we need not reach the second step: whether the officers' conduct was objectively unreasonable in the light of clearly-established law at the time of the violation.") (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)).  Each of the officers is entitled to qualified immunity.

Furthermore, because Mr. Byrd's federal rights have not been violated, there can be no municipal liability for either the City of Shreveport or the City of Bossier.  Id. at 338 ("As held supra, the Officers were entitled to qualified immunity.  Therefore, summary judgment was proper for the City.").  Mr. Byrd's parallel Louisiana tort claims are analyzed under the same "reasonableness" standard as his federal claims.  Winston v. City of Shreveport, 390 F. App'x 379, 385-86 (5th Cir. 2010) (citing Reneau v. City of

---

(conclusory allegations, speculation, and unsubstantiated assertions are not competent summary judgment evidence and will not satisfy the plaintiff's burden).  The Court fails to see how the other portions of the policy that were allegedly violated—that canines only be used to search for felony suspects and as a supplement to police power—were actually violated by Corporal Yarborough.  There is no genuine dispute that Mr. Byrd was a suspected felon at the time Mico was used; and Mr. Byrd has failed to offer any argument or evidence to show that Mico was not used as a supplement to police power.  Furthermore, the Court fails to see how Corporal Yarborough's failure to file a report on the use of Mico violates Mr. Byrd's Fourth Amendment rights.

New Orleans, No. Civ.A. 03-1410, 2004 WL 1497711, at *3-4 (E.D. La. July 2, 2004)

(citing Kyle v. City of New Orleans, 353 So. 2d 969, 973 (La. 1977))).  Accordingly, for

the reasons given above, Mr. Byrd' state law claims must be dismissed as well.

**IV.      Conclusion**

For the foregoing reasons, **IT IS ORDERED** that the Defendants' Motions for

Summary Judgment [Record Documents 38 and 41] be and hereby are **GRANTED**.  All

claims against all Defendants are **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 29th day of May,

2014.


ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE